IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DEERE & COMPANY,

                Plaintiff,

        v.

AGCO CORPORATION and
PRECISION PLANTING LLC,

                Defendants.

Civil Action No. 18-827-CFC
CONSOLIDATED

---

Adam W. Poff, Pilar Gabrielle Kraman, YOUNG CONAWAY STARGATT &
TAYLOR,LLP, Wilmington, Delaware; Richard L. Rainey, Kevin B. Collins, R.
Jason Fowler, Jay I. Alexander, Daniel E. Valencia, Nicholas L. Evoy, Rajesh D.
Paul, Pratik Agarwal, COVINGTON & BURLING LLP, Washington, District of
Columbia, Michael R. Morey, COVINGTON & BURLING LLP, Palo Alto,
California, Megan L. Hare, COVINGTON & BURLING LLP, New York, New
York; Nathan S. Mammen, KIRKLAND & ELLIS LLP, Washington, District of
Columbia

       *Counsel for Plaintiff*

Jack B. Blumenfeld, Jeremy A. Tigan, Anthony D. Raucci, MORRIS, NICHOLS,
ARSHT & TUNNELL LLP, Wilmington, Delaware; Michael J. Summersgill,
Mark G. Matuschak, Jordan L. Hirsch, Michaela P. Sewall, Harry D. Hanson,
WILMER CUTLER PICKERING HALE AND DORR LLP, Boston,
Massachusetts; Mary V. Sooter, WILMER CUTLER PICKERING HALE AND
DORR LLP, Denver, Colorado; Heath A. Brooks, R. Gregory Israelsen, WILMER
CUTLER PICKERING HALE AND DORR LLP, Washington, District of
Columbia

       *Counsel for Defendants*

**<u>OPINION</u>**

March 28, 2023
Wilmington, Delaware

*Colm F. Connolly*

COLM F. CONNOLLY
CHIEF JUDGE

After a four-day trial, a jury found that Plaintiff Deere & Co. failed to prove that Defendants AGCO Corp. and Precision Planting LLC (collectively, Precision) infringed claim 1 of U.S. Patent No. 8,813,663 (the #663 patent) and claim 20 of U.S. Patent No. 9,699,955 (the #955 patent). Consistent with the jury instructions and verdict form, the jury did not return a verdict on the validity of the asserted claims or damages. D.I. 466. I therefore entered judgment of noninfringement in Precision's favor. D.I. 474.

Pending before me is Deere's Motion Under [Federal] Rules [of Civil Procedure] 50, 52, 54, 59, And 60 For Judgment As A Matter Of Law, For A New Trial, And/Or To Reconsider, Correct, Or Amend Judgment. D.I. 482. Deere seeks by its motion vacatur of the verdict form and the judgment of noninfringement and entry of a judgment as a matter of law (JMOL) of infringement and no invalidity of the asserted claims. D.I. 482 at 1. Alternatively, Deere seeks a new trial and dismissal of Precision's invalidity counterclaims. D.I. 482 at 1.

## I.   BACKGROUND

### A.   The Asserted Claims

The asserted patents are directed to farming equipment and methods for planting seeds.  Claim 1 of the #663 patent covers a seeding machine that comprises, among other things, "a seed delivery system."  Claim 20 of the #955 patent, which depends from claim 19 and claim 16, covers a "method of delivering seed."  The parties referred to the "seed delivery system" and "method of delivering seed" limitations and similar claim limitations in 11 other patents that were originally asserted by Deere in this case as "the seed delivery system" terms.  *See* D.I. 173 at 10–11.

### B.   The Accused Products

Deere alleged that Precision's use, sale, and manufacturing of its SpeedTube and vSet2 meter infringed both claims asserted at trial.  The SpeedTube and the vSet2 meter are used together.  The SpeedTube has a flighted belt.  Tr. of July 5–8, 2022 trial 856:5 (hereinafter Trial Tr.).  The "flighted belt has flights . . . that are equally spaced, and the seeds [are] received in between those flights and . . . carried downward toward the furrow."  Trial Tr. 855:22–56:1.  The SpeedTube uses a "paddle wheel design" for loading the seeds into the flighted belt.  Trial Tr. 866:1–3.  Precision at times called the paddle wheels "feeder wheels" or "loading wheels."  Trial Tr. 867:7–10.  When the seeds "make contact with the feeder wheels," they are "projected and accelerated downward for a distance, eventually

2

received by the belt," "carried down [in the belt]," and "eventually discharged rearward at the bottom" into a furrow.  Trial Tr. 871:5–13.

Deere presented at trial these photos of relevant portions of the SpeedTube:





D.I. 489-2 at A3608.  The top image displays the feeder wheels and the top of the flighted belt.  The bottom image shows a mid-portion of the flighted belt.

The vSet2 seed meter consists of a rotating plate that takes a seed from a seed reservoir and "drops the seed off" at the SpeedTube's feeder wheels.  Trial Tr. 380:8–22.  Below is the image of the SpeedTube in combination with the vSet2 meter that Deere's expert showed the jury:



vSet2

SpeedTube

SpeedTube-vSet2
Combination

D.I. 486-2 at A1991.

### C.    Relevant Pretrial Proceedings

On December 3, 2019, I held a *Markman* hearing to address the parties'

disputes about certain claim terms, including the seed delivery system terms.

Deere argued that no construction of the seed delivery system terms was necessary.

D.I. 173 at 10–11.  It argued in the alternative that, "[t]o the extent a construction

is necessary," the term "seed delivery system" "should be construed to mean:

'[a]ssembly of components that delivers seeds,'" D.I. 173 at 10, and the term

"method of delivering seed" "should be construed according to its plain and

ordinary meaning," D.I. 173 at 11.

4

Precision argued in its *Markman* briefing that the terms should be construed as "apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position." D.I. 173 at 10–11. Precision also argued that the patents had a "disclaimer" that "the seed delivery apparatus / system / method does not allow for seeds to drop by gravity between the seed meter and discharge." D.I. 173 at 10. At the *Markman* hearing, Precision again requested that I "give the seed delivery system terms their *construction* . . . which requires that they remove the seed from the seed meter by capturing it" and that I "*further instruct* the jury that Deere has disclaimed systems with [a] gravity drop." Tr. of Dec. 3, 2019 hr'g 150:13–17 (hereinafter *Markman* Tr.) (emphasis added); *see also Markman* Tr. 157:20–23 ("So it would be in addition to the definition you just provided, you would also instruct [the jury] that the patent owner has the claims and the patent claims do not include a gravity drop.").

I concluded at the hearing that "Precision has the better argument in terms of the definition of the seed delivery system in the [#]663 patent" and certain related patents, including the #955 patent, and I held that "it's appropriate therefore *to construe the term for the [#]663 patent [and related patents] to include capturing of the seed and the delivery [to] discharge.*" *Markman* Tr. 151:21–22, 152:9–11 (emphasis added); *see also Markman* Tr. 154:15–17 ("I'm going to adopt the

5

construction proposed by Precision of seed delivery system[.]"); 157:3–6 ("I would say that [for] any patent that shares the written description of the [#]663 patent, which begins with the words, [']the present invention provides for,['] that I have ruled on any patent that is affected by that."). At no point did I say or suggest that I was *construing* the seed delivery system terms to include a disclaimer.

At the conclusion of the *Markman* hearing, I asked Deere to draft for my signature a "proposed order on the terms I ha[d] construed" that day. *Markman* Tr. 215:6–7. On December 16, 2019, Deere submitted what it called a "form of order reflecting the Court's claim construction rulings to date." D.I. 188-1 at 1. Section III of that order reads:

### III.    "SEED DELIVERY SYSTEM" TERMS

| TERM | PATENT(S) / CLAIM(S) | COURT'S CONSTRUCTION |
|---|---|---|
| "seed delivery system" / <br><br>"delivery system" / <br><br>"seed delivery apparatus" / <br><br>"method of delivering a seed" | '663 Patent: Claims 1 and 6<br><br>'199 Patent: Claims 1 and 5<br><br>'429 Patent:  Claims 19 and 20<br><br>'955 Patent: Claims 19, 20<br><br>'924 Patent: Claims 12, 15<br><br>'906 Patent: Claims 4 and 6<br><br>'031 Patent: Claims 8 and 16<br><br>'173 Patent: Claim 6<br><br>'998 Patent: Claim 3<br><br>'799 Patent: Claim 2<br><br>'502 Patent: Claims 14, 19 and 22 | For '663, '199, '429, '955, '924, '906, '031, '173 patents:<br>**"apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position"**<br><br>No  disclaimer of a seed delivery apparatus / system / method that allows for seeds to drop by gravity between the seed meter and discharge.<br><br>For '799, '998, '502 patents:<br>**Plain and ordinary meaning.**<br><br>No disclaimer of a seed delivery apparatus / system / method that includes a belt with flights. |

D.I. 188 (emphasis in the original).  To be clear, it was Deere who put in bold font and within quotation marks under the heading "Court's Construction" the very construction I had given to the seed delivery system terms in the #663 and #955 patents at the *Markman* hearing.  And it was Deere who did not put in bold font or within quotation marks under the heading "Court's Construction" the phrase "[n]o disclaimer of a seed delivery apparatus / system / method that allows for seeds to drop by gravity between the seed meter and discharge."  Thus, the proposed order

7

Deere submitted shows that Deere understood exactly what I had done at the
*Markman* hearing: I had *construed* the seed delivery system terms in the asserted
patents to mean "apparatus / system / method that removes seed from the seed
meter by capturing the seed and then delivers it to a discharge position"; and I had
*rejected Precision's contention* that the asserted patents disclaimed apparatus,
systems, and methods that allow for seeds to drop by gravity between the seed
meter and discharge.

On December 17, I signed and entered the order.  D.I. 191.  The next day,
December 18, 2019, the parties filed and I signed a stipulated order to stay the case
pending resolution of various inter partes review (IPR) proceedings before the
Patent Trial and Appeal Board (PTAB).  D.I. 196.

The case remained stayed for almost two years.  During the IPR
proceedings, Deere told the PTAB that I "ha[d] made the following claim
construction[]: . . .'Seed delivery system' means a 'system that removes seed from
the seed meter by capturing the seed and then delivers it to a discharge position.'"
D.I. 213-1 at 15.  And Deere submitted to the PTAB a declaration in which its
expert, Dr. James Glancey, swore under oath that he had "been informed that [I]
ha[d] *construed* the term 'seed delivery system' to mean 'system . . . that removes
seed from the seed meter by capturing the seed and then delivers it to a discharge
position,'" D.I. 213-1 at 118 (emphasis added), and that he "also underst[ood] that

8

[I] ha[d] *determined* that there is '[n]o disclaimer of a seed delivery apparatus / system / method that allows for seeds to drop by gravity between the seed meter and discharge,'" D.I. 213-1 at 118 (emphasis added; some alterations added).

After the stay was lifted, the parties engaged in discovery and motion practice.

On June 13, 2022, I held a four-and-one-half hour pretrial conference. Notably, Deere never suggested at the pretrial conference or at any time in the more than two years between the *Markman* hearing and trial that my construction of the seed delivery system terms included any language other than "an apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position." Nor did Deere ever ask for clarification of that construction or a construction of any term used in that construction. On the contrary, when Precision sought before trial additional claim construction, Deere *opposed* that request and stated specifically in its opposition that "[n]o further construction of '[seed] delivery system' is required." D.I. 213 at 10.

**D.    Deere's Proposed Verdict Form**

The parties submitted before trial competing proposed verdict forms. Deere's verdict form explicitly instructed the jury not to address the validity of any asserted claim unless it had found that Precision infringed that asserted claim. D.I. 532-4 at 7–9. Deere's form used bold font to emphasize this point, as

9

demonstrated below in images of Deere's proposed infringement and invalidity

instructions for claim 1 of the #663 patent:

## I.   FINDINGS ON INFRINGEMENT

### A.   U.S. Patent No. 8,813,663 ('663 Patent)

**Question 1:**

Did Deere prove, by a preponderance of the evidence, that Defendants' Accused
Products infringe claim 1 of the '663 Patent?

("YES" is a finding in favor of Deere, and "NO" is a finding in favor of
Defendants. *See* Jury Instructions Sections 4.1–4.4.)

| '663 Patent | Infringed?<br>(Answer "YES" or "NO") |
|---|---|
| Claim 1 | YES _____   NO _____ |

Continue to the next question.

10

### III.   FINDINGS ON VALIDITY

#### A.   U.S. Patent No. 8,813,663 ('663 Patent)

Answer this question (Question 5) only if you answered "YES" to Question 1.
**Otherwise do not answer the question.**

**Question 5:**

Did Defendants prove, by clear and convincing evidence, that claim 1 of the '663 Patent is invalid?

> (If you find the claim invalid for a particular ground, answer "YES," otherwise answer "NO" for that ground. "YES" is a finding in favor of Defendants, and "NO" is a finding in favor of Deere. *See* Jury Instructions Section 5.)

| Invalidity Ground | '663 Patent Claim 1 Invalid? (Answer "YES" or "NO") |
|---|---|
| Obvious in light of the prior art and other evidence of record | YES _____   NO _____ |
| Lack of enablement | YES _____   NO _____ |

Continue to next question.

D.I. 532-4 at 3, 6.

### E.        Relevant Trial Issues and Proceedings

#### 1.       Deere's "No Disclaimer" Slides, Testimony, and Argument

Trial began on July 5, 2022. The morning of the first day of a trial in any case is always hectic. In this case, it seemed particularly so. As the citizens called for jury duty that morning waited patiently outside the courtroom for the jury selection process to begin, Precision's counsel asked me to resolve a host of issues concerning the slides Deere intended to use during its opening statement.

11

One of those slides—titled "Court's Definition"—lies at the heart of Deere's pending motion:



**Court's Definition**

1. A seeding machine, comprising:

a **seed meter** having a metering disk with a plurality of apertures in a circular array adapted to adhere seeds to the metering disk to move the seeds along a seed path as the metering disk rotates;

a **seed delivery system** associated with said seed meter, said seed delivery system including:

a **housing** for seed from said metering disk, the housing having a lower opening through which seed is discharged;

a single **endless member** within said housing disposed around a first drive pulley and a second idler pulley, said endless member engaging seed from the seed meter and moving the seed to said lower opening where seed is discharged from said housing; and

a **loading wheel** engaging seeds adhered to the metering disk and moving the seed past and guiding the seed into the single endless member whereby the single endless member moves the seed to the lower opening.

"**seed delivery system**"

"system … that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position"

No disclaimer of a seed delivery system that allows for seeds to drop by gravity between the seed meter and discharge.

PDX1-29

D.I. 486-1 at A1935; *see also* Trial Tr. 24:17–25:5 (Precision's objection).

Given the layout of the slide, the two years that had passed between the *Markman* hearing and trial, and the fact that Deere had never sought further construction of the seed delivery system terms, the significance of the slide and why Precision would object to it was not readily apparent to me. I had not seen the *Markman* order since I signed it two years earlier. I had no recollection of the order, and no one offered me a copy of the order that morning. Once I had a chance to briefly review the slide, the following discussion ensued:

> [PRECISION'S COUNSEL]: . . . . So our point here is that the definition of the term is what's in the top of this box. It's a system that removes seed from the seed

12

meter. The rejection of our disclaimer argument isn't part of the definition of the term. That's just rejecting -- it's the rationale that's rejecting our claim construction argument on the disclaimer issue.

So we don't think that should go to the jury. We think that would confuse the jury.

THE COURT: Well, it's going to confuse them because it's confusing me. I mean, I have to step back, like, ["]no disclaimer of a seed delivery system.["] If I'm on the jury, I'm going to go, ["]what?["]

So let me step back. You don't dispute that the first quotation in the box comes from my construction of the term. So that is properly in front of the jury?

[PRECISION'S COUNSEL]: Absolutely.

THE COURT: And it, in fact, is going to be part of the jury instructions?

[PRECISION'S COUNSEL]: Yes.

THE COURT: All right. Then they're adding gloss to that by saying, essentially, I guess, explicating the claim construction by saying there's no disclaimer of a seed delivery system that allows for seeds to drop by gravity.

[PRECISION'S COUNSEL]: Correct. And that's because we argued based --

THE COURT: Hold on.

Part of me is laughing. Do you think -- [Deere's counsel], do you think a jury is going to even -- what are you going to say? I mean, if I'm a juror, I'm going to go, what are you saying? No disclaimer of a seed delivery system that allows for seeds to drop.

13

[DEERE'S COUNSEL]:  I'm happy to show you how
this has come up, Judge.

THE COURT:  Well, let me hear from [Deere's counsel],
then, because I'm confused anyway.

[DEERE'S COUNSEL]:  . . . So just a little bit of
background on this, Judge.  First of all, at the *Markman*
hearing, what they argued to you was they wanted, in
addition to the definition that we just looked at, which I
think everybody agrees is appropriate, removal by
capture, they said, so it would be in addition to the
definition you just provided.  You would also instruct
that the patent owner has the claims and the patent claims
-- I'm sorry, do not include a gravity drop.  They asked
you to find that the claims were narrower than their
literal scope.

THE COURT:  Okay.

[DEERE'S COUNSEL]:  Their literal scope, given that
you've rejected their disclaimer, the literal scope of these
claims includes gravity drop, free-fall.

Now, I just handed up . . . a marketing slide from
Deere that they're going to put up.  And they're going to
argue in this case, that the claims -- your claim
construction excludes free-fall.  Because on the bottom
right-hand corner it says . . . "Funneled hand off with
free-fall to belt."  They're going to say that's excluded
under your claim construction.  We litigated this at [the]
*Markman* [hearing], Judge.  [Y]ou said gravity drop is in
the scope of the claims.

So we're trying to figure out a way, if there's a
more plain English way of saying that, and I'm amenable
to that, that would be fine.  But you have ruled as a
matter of claim construction in this case that "gravity
drop free-fall" is not excluded from the scope of the
claims.

14

> They are going to argue directly contrary to your
> claim construction. This issue has been joined now. Or
> they are going to imply it. One way or the other. [The
> Deere marketing slide Precision intended to use at trial]
> makes it plain.

TrialTr. 26:12–29:12.

Precision denied Deere's accusation. Its counsel insisted:

> We are not going to argue contrary to your claim
> construction. . . . We are not going to argue that the
> claims exclude a gravity drop between the meter and the
> belt. This slide isn't arguing that. This is Deere talking
> about [Precision's] system.
>
> We are going to argue that [the vSet2 and
> SpeedTube] don't remove by capture, and we'll point to
> [Deere's] criticism of our system in this slide to show
> that we don't remove by capture.

Trial Tr. 30:6–16.

I decided to let Deere show the disputed slide to the jury. Truth be told, I

thought the slide was a non-issue. It was not inconsistent with my claim

construction; and, in any event, I doubted a jury would have any idea what a

disclaimer was:

> THE COURT: Look, I'm going to let this in. And the
> claim does not preclude drop by gravity. You admit that.
>
> [PRECISION'S COUNSEL]: Yes.
>
> THE COURT: You admit that. I ruled that. Who knows
> if I'm right or wrong. You'll go up to the Federal
> Circuit, they'll decide. And, frankly, I just think --

15

> [DEERE'S COUNSEL]: Judge, we are happy to phrase
> it that way [i.e., that the claim does not preclude drop by
> gravity].
>
> THE COURT: Listen, if I were you, that's how I would
> phrase it, because I'm thinking like a juror, not like you.
> You want to call it no disclaimer seed delivery, go for it.
> To me, you're going to have to explain it to the jury what
> it means. And that's how I'd explain it.

Trial Tr. 31:2–16.

At this point, Precision's counsel said, "I'm more concerned about them

taking your claim construction, that rationale, and changing it." Trial Tr. 31:18–

20. Mindful that the jury pool was waiting outside and that Precision had further

issues to resolve before the jury selection process could begin, I responded:

> [W]e'll move on. This is going to depend [on] how it
> arises in trial. . . . Here's the thing. As the evidence
> comes in, I can always under *[O]2 Micro[]* decide I
> misconstrued the claims and reconstrue [the term], right?
> I can do that at jury instructions, right?[1]
>
> [PRECISION'S COUNSEL]: You can, Your Honor, and
> --

---

[1] *See In re Papst Licensing Digital Camera Pat. Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015) ("[A] district court may (and sometimes must) revisit, alter, or supplement its claim constructions (subject to controlling appellate mandates) to the extent necessary to ensure that final constructions serve their purpose of genuinely clarifying the scope of claims for the finder of fact.") (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008) and *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1377 (Fed. Cir. 2005)).

THE COURT:  I guess we'll take that risk.  We'll see.

Trial Tr. 31:22–32:19.

When, during his opening, Deere's counsel showed the jury the disputed

slide, he stated:

> So you might -- so you might ask yourself, then, . . . what
> is this case all about?
>
> Well, the Court has provided some guidance as to
> the meaning of the term "seed delivery system" as it
> appears in the claim.  And as you can see, the Court's
> definition further specifies that the seed delivery
> system must be a system that removes seed from the meter by
> capturing the seed and then delivering it to a discharge
> position.
>
> *The Court went on to make clear that there is no
> disclaimer of a seed delivery system that allows the seed
> to drop by gravity between the seed meter and discharge.*
>
> *We submit, in other words, some influence of
> gravity or free-fall on the seed is allowed expressly by
> the claim* so long as the seed is nevertheless removed
> from the meter by capturing and delivering it to the
> discharge position.

Trial Tr. 145:9–24 (emphasis added).

There being no contemporaneous objection lodged by Precision, I did not

focus on Deere's counsel's wording and failed to appreciate at the time that his

statement that "some influence of gravity or free-fall on the seed is allowed

expressly by the claims" was not true and could confuse and mislead the jury.  In

point of fact, neither asserted claim *expressly allows* for "some influence of gravity

17

or free-fall." And I had never suggested when I rejected Precision's disclaimer argument at the *Markman* hearing that the claims expressly allow for "some influence of gravity or free-fall." Neither claim uses the words gravity or free-fall or synonyms of those words. And neither claim expresses anything about the influence of gravity or free-fall on a seed.

More fundamentally, patent claims do not expressly allow anything. "[P]atents are 'public franchises' that . . . give[] the patent owner 'the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States.'" *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373–74 (2018) (quoting 35 U.S.C. § 154(a)(1)). Patents bar others from practicing an invention without the patent holder's permission or acquiescence. *See Eldred v. Ashcroft*, 537 U.S. 186, 217 (2003) ("The grant of a patent . . . *prevent*[*s*] full use by others of the inventor's knowledge." (emphasis added)). Patent claims *prohibit*—the very antithesis of *allow*. Licenses and permits allow. Patents do not.

Deere's counsel's "allow expressly" language, it turns out, was not accidental. This fundamental mischaracterization of patent claims as affirmatively allowing what they do not exclude permeated Deere's infringement presentation at trial and lies at the heart of Deere's pending motion.

18

The issue next arose on the second day of trial during the direct examination of Deere's infringement expert, Dr. Glancy, when Deere put in front of the jury a slide that looked very similar to the disputed slide it had used during its opening. Trial Tr. 388:14–89:1. Precision's counsel objected and during an ensuing sidebar conference the following discussion occurred:

> [PRECISION'S COUNSEL]: The objection is that same objection I made.
>
> THE COURT: When you say "same objection," let's be clear. You didn't object -- this slide is not exactly the same. You objected to an opening slide. I said they could use it. I didn't think they should. I didn't think the jury would understand it . . . . I also didn't think it was my claim construction.
>
> So let's concentrate on this slide. You have an objection based on what?
>
> [PRECISION'S COUNSEL]: Fair enough. Based on the bottom portion. That disclaimer language is not part of your claim construction. That's your rationale. The bottom portion is the Judge's rationale for rejecting one of our claim construction arguments. It's not the definition itself.
>
> [DEERE'S COUNSEL]: We disagree. Your order under the heading "Claim Construction" has both parts of that, and that was an agreed order that was submitted. It was argued. You rejected their argument that there was a disclaimer. You asked us to propose an order. We did. We sent it to the other side. They agreed. It said -- I don't have it with me.
>
> THE COURT: Could I quickly see the order? Can you get that?

[DEERE'S COUNSEL]:  I have it.

[PRECISION'S COUNSEL]:  Here's the concern.

THE COURT:  I don't want the concern; I want to read the order.  I am concerned, so I want to read the order.

Trial Tr. 389:14–90:18.

At this point, Deere's counsel handed me a copy of the *Markman* order, and

this discussion ensued:

THE COURT:  [Precision's counsel], I have in front of me the order.  It was a proposed order given to me by the parties.  And under the column heading "Court's Construction," it does have this disclaimer language that you are objecting to.  If I had put the order together myself, I don't think I would have put the rationale in the order.  The problem is it was submitted by the parties and *it's a fair reading given the way the order is structured to say that the [qu]ote "no disclaimer" is part of the construction of the term.*

[PRECISION'S COUNSEL]:  Your Honor, we never agreed that was part of the definition.  We agreed -- [you] rejected our disclaimer argument.  They insisted on putting that in.  The issue here is, the fact that there is no disclaimer doesn't mean it affirmatively can include a gravity drop.  There is an issue here.  They are trying to use it to affirmatively suggest something that's beyond your construction.

THE COURT:  Unfortunately, the way the order is phrased, I can understand why someone would rely on it.  *It's a fair reading of the order which was presented to me.  I mean, nobody contested this order.*  This is what was given to me.

20

[PRECISION'S COUNSEL]:  Because we didn't contest your rationale for -- well, we didn't contest the fact that you had, in fact, rejected our disclaimer.  We never intended it to be part of [the] definition.

THE COURT:  You may not have intended, but that is the way the order is fairly read.  *I will overrule the objection.  And we will spell it out at a break.*

[PRECISION'S COUNSEL]:  There's one quick question.  They are going to ask Mr. Glancey to now interpret that disclaimer language.  I think that would be highly improper.  He is -- they are going to ask him to explain that disclaimer.  So their expert describing your rationale and the way that -- suggesting the claim affirmatively allows gravity drop.  But I think that, at least, will be improper.

THE COURT:  So it's funny.  Now, I disagree with that.  I will allow that line of questioning.  *I will say this, though, for the record.  I think Deere has overreached.  I signed that order.  When I signed the order, I did it because, frankly, it was presented to me as a stipulated order.  I would have said, had I drafted the order, sua sponte.  I would have said my construction is the first paragraph.  I would have said the rationale for my rejection of Deere's additional limitation was the "no disclaimer" language.  And I think Deere is, frankly -- I think they are taking a risk pursuing this as if it is my construction.*

And don't forget *[O]2 Micro*.  I can construe the claim at any point during the proceedings.  And I need to rethink that because *I don't think a Court's statement that there is no disclaimer constitutes claim construction.*

*But the problem is it -- is the slide has been shown to the jury already.  It is a fair reading of the stipulated order.  So I think it would be unfairly prejudicial to Deere right now to say you can't continue with that slide.*

21

> *However, I think they've gone down a road, I think, they have overreached. I do not think a Court's statement on the record rejecting an argument that there's a disclaimer constitutes claim construction.*
>
> *All right. So you can play it however you want.*
>
> [DEERE'S COUNSEL]: Okay.
>
> [PRECISION'S COUNSEL]: Thank you.
>
> THE COURT: *There is going to be a risk. I will hear further argument on it.* I will have to reread *[O]2 Micro.* I think I am permitted to construe the claim at any point in the process.

Trial Tr. 390:22–93:18 (emphasis added).

After this sidebar, I reread *O2 Micro* and, more importantly, reviewed more carefully the stipulated *Markman* order I had signed. After further considering the order and how the trial was unfolding, I told the parties during a subsequent sidebar that:

> I'm not going to allow Deere to put in front of the jury again that I have construed the claim to say no disclaimer. I've thought a lot about it. I think it was fair for you [Deere] to do what you did in opening, because as I mentioned at sidebar, it was a stipulated order that they signed onto. And you didn't sandbag them when you put it in your opening. It was appropriate. And because it was in the opening, I let you all use it at least one other time.
>
> But the truth of the matter is, and as shown by the quotations, in the box, in the order on Page 3, I construed the term to be "removal by capture" and then "delivery."

22

That's not verbatim. But that was in quotes. The disclaimer is not in quotes, and I never intended it to be part of a construction.

I think it will confuse the jury for it to be put in front of them again. You are free to argue, and I expect you all will, that where in that claim does it say you can't have any kind of free-fall. And you can show a seed and show that it can be movement, and you can say a prisoner is captured, but he can move within his cell. You can do that. I don't think you need this. I said that at opening. I actually think it's a little bit confusing.

[Deere's counsel], you want to say something on that?

[DEERE'S COUNSEL]: One quick comment about what you [s]aid about the fairness of doing this in opening. I ask that there be no argument made about the fact our slides had it in the opening.

THE COURT: Oh, that's for sure. And unless you [Precision] agree to that, I'm going to let them show the slides.

[PRECISION'S COUNSEL]: That's fine, Your Honor. I agree.

[DEERE'S COUNSEL]: And just for the record, it's in the slides now because we just disclosed the same slide. I'm going to remove it.

THE COURT: I wish you would. I think in fairness, and I'm trying to accomplish fairness.

[DEERE'S COUNSEL]: No problem.

THE COURT: And so, [Deere's counsel], you're not going to be punished for it being in your opening. And [you] can just say -- I mean, if you want to use the word

23

> "disclaimer," I'm not sure who knows what a disclaimer
> is on the jury, right? But your point can still be made.
>
> [DEERE'S COUNSEL]: Yes.
>
> THE COURT: Right?
>
> [DEERE'S COUNSEL]: Judge, we're fine with that.
> Just didn't want to -- we're not trying to do anything
> improper.
>
> THE COURT: Oh, I know. Believe me, I absolutely
> believe that.

Trial Tr. 1030:11–32.11.

The issue of whether Deere's "no disclaimer" language should be part of

claim construction arose again when the parties discussed with me final jury

instructions after the third day of trial. *See Trial* Tr. 1140:13–16. I told Deere's

counsel:

> I've already ruled on that, and *you're good to argue [no
> disclaimer]. You are free to argue it.* And I will say this,
> I'm going to repeat this, because, you know, the
> defendants need to be careful what they say on this point,
> and I am very comfortable that, if a question arose from
> the jury, you know, asking, for instance, you know, well,
> is there a disclaimer of a seed-delivery system? If they
> ask that question, then we're into claim construction, and
> I [would] feel obligated to answer.

Trial Tr. 1140:17–41:1 (emphasis added). Deere did not object or otherwise

respond during this exchange. *See id.* And in his closing argument, Deere's

counsel stated, "[T]he Court has made clear that the claim permits -- does not

exclude gravity drop. And you will not hear the defendants' counsel say that it does not include gravity drop." Trial Tr. 1204:12–15.

The final jury instructions given to the jury included these claim constructions:

| CLAIM TERM | DEFINITION |
|---|---|
| "seed delivery system" | "system that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position" |
| "method of delivering a seed" | "method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position" |

D.I. 488-2 at A3126–27 (reproduced). These constructions are identical to the respective constructions of the seed delivery system terms set forth in the *Markman* order. *See* D.I. 191 at 3. The jury never asked for further clarification of these constructions. *See* D.I. 472.

## 2.   Agreement and Testimony Concerning "Capture"

In his opening, Deere's counsel made the following statement, which bears directly on Deere's pending motion:

> Let's talk about capture. You will be instructed that the terms in patent claims are to be given their meaning to a person of ordinary skill in the art at the time of the invention.
>
> So what does "capture" mean to a person of ordinary skill in the art? And you're going to hear testimony from witnesses on this. But here are two

>   meanings of capture from dictionaries that are relied
>   upon by Deere's witnesses.
>
>       First -- the first dictionary defines "capture" as
>   taking into possession or control by force.  The second
>   dictionary defines "capture" as taking someone as a
>   prisoner or taking something into your possession.
>
>       So the evidence will show that removing a seed
>   from the seed meter by capturing the seed means that the
>   seed delivery system, here SpeedTube, takes the seed
>   from the meter into possession or control by force or
>   takes the seed from the meter as a prisoner.

Trial Tr. 146:5–22.  During trial, both parties offered expert testimony on the issue

of infringement.  Deere's expert, Dr. Glancey, testified first.  Over Precision's

objection, I permitted Deere to introduce into evidence and ask Dr. Glancey

questions about the *Oxford English Dictionary*'s definition of "capture" as "take

into one's possession or control by force."  Trial Tr. 399:14.  Based in part on that

definition, Dr. Glancey testified that he did not think that an object has "to be in

physical contact with something else at all times in order to be captured."  Trial Tr.

399:15–19.

Dr. Glancey also provided an example of capture based on the dictionary

definition:

>       So we have a suspect on the left image being taken
>   into possession and captured by a police officer on the
>   left.  So they're taken into custody, in a manner of
>   speaking.  The middle image shows they now arrived at
>   the jail, and that individual, the suspect, is being directed
>   into the jail cell.

26

> The police officer is not physically contacting him,
> that suspect, but I don't think anyone would dispute he's
> still captured by the judicial system -- judicial system.
> Even though that police officer is not literally touching
> that person, but he's still guiding them in and pushing --
> putting them into and directing them to the jail cell itself.
>
> So they're directed into the cell even though the
> police officer is not literally having him -- not touching
> him, per se.
>
> The image on the right shows, now, that suspect is
> in the jail cell.  They are locked in with a cell.  The door
> is closed.  That individual, I think we would all agree,
> still remains captured even though the police officer is
> not there.
>
> I think we would also agree, they're still captured
> despite the fact that individual can get up and walk
> around the cell, but they're still captured.

Trial Tr. 400:3–01:1.  This definition was not from any source specific to the field

of the invention.  And, to state the obvious, Dr. Glancey's example of capture had

nothing to do with the field of the invention.

Precision's expert, Dr. Fleming, defined "capture" as "controlling all of the

aspects of the motion of the seed."  Trial Tr. 1001:5–6.  During cross-examination,

Deere asked Fleming about his use of *Webster's Dictionary for Students*.  Trial Tr.

1075:8–11 ("Q: You don't seriously contend that a person with ordinary skill in the

art would consult a children's dictionary to understand how a term in the

agricultural field would be understood, do you?").  Fleming's report refers to

*Webster's Dictionary for Students*, but he did not discuss the dictionary during direct examination. Fleming explained that he did not see a problem with using this dictionary, and he noted that it was only one of the sources he considered. Trial Tr. 1075:3–7, 12.

Precision later requested a jury instruction "that 'removal by capture' means removal by capture and not capturing after removal." Trial Tr. 1141:6–10. I rejected that request when the jury was not in the courtroom:

> THE COURT: I'm inclined just to leave it as I've constructed, right. But, I mean, here's the key. My construction was: "A system that removes seed from the seed meter by capturing." That's what it says, "and then delivery."
>
> * * * *
>
> . . . I guess you can argue [that capture happens after removal], but you can open some problems it seems to me. If the capture is in the belt, that's not the removal, you know. Removal is occurring when that [seed] is plucked, grabbed, removed, sucked, dislodged, whatever it is, it's from the seed meter, that's the removal.
>
> [DEERE'S COUNSEL]: We have argued consistently that the removal happens at the meter, and it's captured the entire way down.
>
> THE COURT: And that's fair. But just so you know, they could argue it doesn't have to be captured all the way down. And if they do and the jury says -- if the jury came back and says: Does it have to be captured after the removal? I'd say, no. Claim construction, it does not.
>
> [DEERE'S COUNSEL]: And I think there may be dispute about where the removal happens.

THE COURT:  Well, the removal has to happen
contemporaneous with the -- and you pick -- the
separation from the seed meter.  So as soon as it
separated from the seed meter, it's removed. . . .

\* \* \* \*

THE COURT:  My point is just it's the removal from the
seed meter.

[DEERE'S COUNSEL]:  Yes.  We're focusing on [that
part of the] system.

THE COURT:  Okay.  Great.

[DEERE'S COUNSEL]:  So just to be clear, Your
Honor, you're going to strike this proposal by Precision,
then?

THE COURT:  Yes.  And just to be clear, just to be
really clear, if there's a suggestion in Deere's closing that
that removal is when the seed is confined within a cell in
the belt, I think you're opening up a door for clarification
of construction or something.

Trial Tr. 1141:13–43:14.  The jury did not hear any of these exchanges or remarks.

At no point during trial did Deere ask for a construction of the term

"capture" or a reconstruction of the seed delivery system terms.  At no point did

Deere ever suggest at trial that the competing experts' testimony raised a claim

construction dispute over the meaning of "capture" or the seed delivery system

terms.  Even when I made the following comment to the attorneys about

capturing—again, outside of the jury's purview—Deere did not raise any claim

construction concerns:

29

> The jury is going to grapple with, when those two
> loading wheels hit that seed, are they capturing it.  And,
> you know, I almost feel like I should instruct . . . them
> that the capture in that belt, going down to the bottom, is
> irrelevant.  I think . . . the issue is whether it's captured
> by the loading wheel or the wheels.  And it happens in a
> three-thousandths of a second.  And . . . that's what
> they're going to go back and try to figure out.

Trial Tr. 538:15–23.  My comment was followed by a discussion about where

capture takes place, but there was no dispute over the meaning of the word

"capture" itself.  *See* Trial Tr. 539:8–46:4; *see also, e.g.*, Trial Tr. 544:5–8 ("THE

COURT: That's when the capture occurs.  When he sticks him in the cell [i.e., on

the flighted belt], . . . it's irrelevant.  He's already removed him by capture.").  The

jury was not given a construction for the word "capture."  *See* D.I. 488-2 at

A3126–27.

30

### 3.    The Verdict Form

The infringement and validity sections of the final verdict form I gave to the jury were identical in all material respects to the infringement and validity sections in Deere's proposed verdict form.  Thus, for each asserted claim the jury was instructed to "answer" whether an asserted claim was invalid "only if" it had found that the SpeedTube and vSet2 meter infringed that asserted claim, and the jury was warned in bold font: **"Otherwise do not answer the question"** of invalidity.  D.I. 466 at 5–6.

### 4.    Judgment As a Matter of Law Motions

After Precision's case-in-chief, but before closing arguments, both parties moved for judgment as a matter of law (JMOL).  Deere moved for JMOL on the issue of validity:

> [DEERE'S COUNSEL]:  The comment I made before was simply I wanted to -- we were intending to move for JMOL on the issue of validity.  And so I wanted to resolve that before we know whether we're going to recall Dr. Glancey.
>
> THE COURT:  I see.  I'm going to let the -- I'm going to let invalidity go to the jury.
>
> [DEERE'S COUNSEL]:  Okay.  Can we --
>
> THE COURT:  I'm going to defer ruling on your motion and --
>
> [DEERE'S COUNSEL]:  May we file something on the docket just so we preserve appellate rights?

> THE COURT: If you feel like you have to, you can
> confer, yes.

Trial Tr. 1108:2–14.  Deere never filed anything on the docket.

Precision also moved for JMOL.  But unlike Deere, Precision's counsel

stated that Precision "intend[ed] to move for JMOL on all -- essentially all of their

issues, direct infringement . . . contributory, which is the same intent issue as

willfulness, I think, and on damages."  Trial Tr. 1108:15–21.  And, consistent with

that representation, Precision filed on the docket a Rule 50(a) motion for JMOL,

arguing that "no reasonable jury could find for [Deere] on any issue."  D.I. 465

at 1.

I denied Precision's JMOL on the issue of direct infringement.  *See* Trial Tr.

1108:18–19 ("Direct infringement is going to the jury.").  Then, the parties

presented arguments on whether there was sufficient evidence to let the issue of

willful infringement go to the jury.  After hearing the parties' arguments, I found

that "a rational juror could [not] conclude based on the record evidence, even

drawing every inference in favor of Deere, that the defendants willfully infringed

these patents.  And, specifically, [Deere] can't show that the defendants knew that

the patents were being infringed or were willfully blind to infringement."  *See* Trial

Tr. 1132:10–15; *see also* Trial Tr. 1108:23–37:2.  I accordingly granted Precision's

motion for JMOL with respect to willful infringement.  Trial Tr. 1136:23–37:2.

The next day, I also granted Precision's JMOL with respect to contributory infringement.  Trial Tr. 1181:10–23.

## II.    LEGAL STANDARDS

### A.    Renewed Motion for Judgment as a Matter of Law

Under Rule 50(b), "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  "The grant or denial of a JMOL motion is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie."  *TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1133 (Fed. Cir. 2004).

The standards that govern a Rule 50(b) motion "vary according to whether the movant has the burden of proof."  *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976).  For the party having the burden of proof, entry of judgment as a matter of law after a jury verdict "is rare[] [and] reserved for extreme circumstances."  *Id.*  To grant judgment as a matter of law in favor of a party with the burden of proof, the court "must be able to say not only that there is sufficient evidence to support the finding [sought by the moving party] . . . but additionally that there is insufficient evidence for permitting any different finding."

*Id.* (citation omitted)*; see also Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1333 (Fed. Cir. 2019) ("[W]here the movant b[ears] the burden of proof on an issue, JMOL is only granted where 'there is insufficient evidence for permitting any different finding.'" (quoting *Fireman's Fund*, 540 F.2d at 1177)).

A party that does not have the burden is entitled to a judgment as a matter of law "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

In reviewing the evidence to resolve a motion for judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## B.     Motion for a New Trial

Rule 59(a) permits a district court judge, "on motion," to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). A district court therefore has the

34

discretion to order a new trial when the verdict is contrary to the evidence, a

miscarriage of justice would result if the jury's verdict were left to stand, or the

court believes the verdict resulted from confusion. *See Blancha v. Raymark Indus.*,

972 F.2d 507, 512 (3d Cir. 1992).  Granting a "new trial[] because the verdict is

against the weight of the evidence [is] proper only when the record shows that the

jury's verdict resulted in a miscarriage of justice or where the verdict, on the

record, cries out to be overturned or shocks our conscience." *Williamson v.

Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).

## III.    DISCUSSION

### A.    Relief under Rules 52, 54, and 60

Consistent with the title of its motion, Deere says in the first sentence of its

opening brief that it brought the motion "pursuant to Rules 50, 52, 54, and 59."

D.I. 483 at 1.  That sentence is the only occasion where Deere mentions Rules 52,

54, or 60 in its briefing.  It does not otherwise cite, let alone discuss the substance

of or standards that govern, those rules.  Deere has therefore waived any arguments

that it is entitled to relief under Rules 52, 54, or 60. *See Higgins v. Bayada Home

Health Care Inc.*, 2023 WL 2518345, at *7 (3d Cir. Mar. 15, 2023) ("[T]he District

Court was not required to consider [the Plaintiff's argument] because 'arguments

raised in passing (such as, in a footnote), but not squarely argued, are considered

[forfeited].'") (quoting *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d

1070, 1076 n.6 (3d Cir. 1997) (some alterations in the original)); *see also id.* ("A passing reference to an issue . . . will not suffice to bring that issue before this court.") (quoting *Laborers' Int'l Union of N. Am. v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) (omission in the original)).  Accordingly, I will deny the motion insofar as it seeks relief under Rules 52, 54, and 60.

### B.    Infringement

#### 1.    Deere Waived its Right to Seek JMOL of Infringement

Precision argues, and I agree, that Deere failed to make a Rule 50(a) JMOL of infringement motion and therefore has waived its right to seek JMOL of infringement under Rule 50(b).  Deere does not dispute that it never made a Rule 50(a) motion for JMOL on the issue of direct infringement.  D.I. 517 at 3–4.  It argues instead that no formal Rule 50(a) motion was required because I said in denying *Precision's* JMOL motion that "[d]irect infringement is going to the jury." D.I. 517 at 3–4 (quoting Trial Tr. 1108:18–19) (alteration in Deere's brief). According to Deere, "it is not essential that there be a formal motion" under Rule 50(a) because the rule's purpose is to "apprise the trial court of the moving party's position to see if any defects can be corrected before the jury retires."  D.I. 517 at 3 (quoting 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2533 (3d ed.)).  And Deere insists that "[a]ll were fully apprised of Deere's position that [Precision] failed to rebut infringement."  D.I. 517 at 3–4.

Rebutting infringement and proving infringement, however, are two different things. As discussed above, the standards that govern a JMOL motion brought by a party with the burden of proof differ from the standards that govern a JMOL motion brought by a party that does not bear that burden. Whether "formal" or "informal," a Rule 50(a) motion "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). And "[a] post-trial Rule 50 motion can only be made on grounds specifically advanced in a motion for a directed verdict at the end of plaintiff's case." *Kars 4 Kids Inc. v. Am. Can!*, 8 F. 4th 209, 220 (3d Cir. 2021) (citation omitted); *see also Lightning Lube, Inc.*, 4 F.3d at 1172 ("In order to preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law at the close of the nonmovant's case, pursuant to Rule 50(a), and specify the grounds for that motion."); *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1347 (Fed. Cir. 2010) ("Under Fed. R. Civ. P. 50(b), a party must have first moved for JMOL under Rule 50(a) at the close of all the evidence in order to preserve the right to renew that same JMOL motion after the jury returns its verdict."). Here, Deere never apprised Precision or me that it intended to move for JMOL of infringement as a matter of law until it filed the pending motion weeks after trial. Accordingly, I will deny Deere's motion insofar as it seeks judgment of infringement as a matter of law.

## 2.   Deere Would Not Be Entitled to JMOL of Infringement

Even if Deere had not waived its right to seek a judgment of infringement as a matter of law, it would not be entitled to such a judgment.  Although Precision did not have the burden of proof, it adduced at trial substantial evidence to show that the SpeedTube and vSet2 meter remove seeds from a seed meter not by capturing them but instead by accelerating and projecting them toward a flighted belt.  A reasonable juror could have concluded based on that evidence that the SpeedTube and vSet2 meter do not infringe the asserted claims' seed delivery system limitations, and thus do not infringe the asserted claims.  *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991) ("[T]he failure to meet a single limitation is sufficient to negate infringement of the claim.").  It cannot reasonably be maintained that "there [wa]s insufficient evidence for permitting any different finding" other than infringement. *Fireman's Fund*, 540 F.2d at 1177 (citation omitted).

On the contrary, there was substantial evidence to support a finding of noninfringement.  That evidence included a slowed-down video of the SpeedTube and vSet2 in operation.  *See* DTX-364.  The video was shown to the jury during the direct testimony of Precision's expert, Dr. Mark Fleming.  The video showed and Dr. Fleming explained to the jury how the removal of the seed from the vSet2 meter occurs.  The removal begins when the paddles of one of the SpeedTube's

38

rotating feeder wheels make contact with the seed. Trial Tr. 995:13–16. Within a

fraction of a second thereafter, the paddles of the second rotating wheel make

contact with the seed. Trial Tr. 995:16–17, 996:3–7. The paddles of both wheels

then accelerate the seed from about one mile per hour (i.e., the speed with which it

is moving on the speed meter) to nine miles per hour, and project it towards a

flighted belt which is moving at approximately nine miles per hour. Trial Tr.

999:19–1000:6. The entire acceleration and projection takes between .003 and

.006 seconds—"about 100 times faster" than the blink of an eye. Trial Tr. 996:14–

25.

Ian Radtke, one of Precision's engineers who worked on the SpeedTube,

also explained the reason that the SpeedTube was designed to project and

accelerate the seeds to prevent seed jamming and damage:

> Q. Why did you want to accelerate seeds into the belt?
>
> A. The -- so to -- to describe the situation, the seed
> meter, the vacuum seed meter disk is turning quite slowly
> relative to the speed of the belt. And so with that wide
> disparity in speed, because that seed's approaching very
> slowly, that first initial contact with the belt can be quite
> violent and erratic. And we learned that if you accelerate
> the speed prior to that first contact, that's a much more
> effective way to get the seeds into the belt.
>
> Q. And what did you mean when you say, "violent and
> erratic?"
>
> A. Well, I guess to use an analogy, if you were to think
> of cars merging onto the freeway, think about coming

> into the onramp from a dead stop in front of a semi-truck,
> well, we can picture the outcome of that
> situation.  Wouldn't be very good.

Trial Tr. 856:22–57:12.  *See also* Trial Tr. 1001:23–02:2 ("[Precision] wanted to accelerate the seed because the belt was moving so fast and the seed on the meter was moving relatively slow.  So [it] wanted to accelerate it to match the speed of the belt.") (Fleming's testimony).

This evidence is more than sufficient to justify a finding of noninfringement. Accordingly, Deere is not entitled to judgment of infringement as a matter of law.

### 3.    A New Infringement Trial is Not Warranted

Deere makes four arguments in support of its request for a new trial on infringement: (1) "the Court's addition and removal—during trial—of requirements from its pre-trial construction of the seed delivery system terms created ambiguity and confusion for the jury, to Deere's prejudice," D.I. 483 at 1; (2) "the construction submitted to the jury failed to resolve the parties' dispute about the fundamental meaning of 'capture,' prejudicing Deere," D.I. 483 at 1; (3) Precision "impermissibly argued two claim constructions at trial—one for infringement and one for invalidity," D.I. 483 at 21; and (4) the Court made various erroneous jury instruction and evidentiary rulings, D.I. 483 at 27–32.  I address these arguments in turn.

a.   **Construction of The Seed Delivery System Terms**

Deere devotes most of its briefing to its argument that a new trial is

warranted because I gave during the trial what it calls "iterative, conflicting,

confusing, and ambiguous constructions" of the seed delivery system terms.  D.I.

483 at 17.  In point of fact, I gave only one construction of the seed delivery

system terms at trial.  And that construction was *verbatim* the construction of the

seed delivery system terms I made before trial—i.e., a system or method "that

removes seed from the seed meter by capturing the seed and then delivers it to a

discharge position." *Compare* D.I. 191 at 3, *with* Trial Tr. 1278:5–7; D.I. 488-2 at

A3126–27.  At no point during trial did I ever give the jury or discuss in the jury's

presence any other construction or potential construction of the seed delivery

system terms.

Here is how Deere frames its argument:

> Pre-trial, the Court held that the "seed delivery system"
> terms (1) mean an "apparatus / system / method that
> removes seed from the seed meter by capturing the seed
> and then delivers it to a discharge position" (the
> "capture" requirement), and (2) do not preclude "drop by
> gravity between the seed meter and discharge" (the "no
> disclaimer" requirement) (together, the "Pre-Trial
> Construction").
>
> Mid-trial, the Court removed the "no disclaimer"
> requirement and, at the end of the trial, redefined its
> construction to require "removing seed from the seed
> meter by capturing the seed…" using only the loading
> wheel.  (together, the "Trial Construction").

41

D.I. 483 at 5–6 (citations omitted).

In unpacking the argument, the first thing to notice is Deere's defined term, the "no disclaimer requirement." Deere uses the phrase "'no disclaimer' requirement" 22 times in its briefing. *See* D.I. 483 at 5–6, 9, 12–14, 17, 20; D.I. 517 at 1–2, 6–9. It is the centerpiece of Deere's motion. The phrase is essentially the same sleight of hand that Deere's counsel executed in his opening statement when he told the jury that the asserted claims "allow expressly" some influence of gravity or free-fall on the seed. As noted above, patent claims do not expressly allow. Finding the absence of a disclaimer, similarly, does not create "a requirement." I rejected Precision's argument that the patents disclaimed methods and systems that allow for a drop by gravity of the seed between the seed meter and discharge. I did not create or impose any affirmative requirement. The consequence of my "no disclaimer" ruling is simply that a system or method can fall within the scope of the asserted claims regardless of whether that system or method allows for seeds to drop by gravity between the seed meter and discharge.

Deere's second defined term, the "Pre-Trial Construction," is similarly misleading. As just noted, I never construed the seed delivery system terms to include my rejection of Precision's gravity-drop disclaimer argument. Deere's inter partes review filings show that it understood as much. It told the PTAB that I "ha[d] made the following claim *construction*[]: . . .'Seed delivery system' means a

42

'system that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position.'" D.I. 213-1 at 15 (emphasis added). And it submitted to the PTAB a sworn declaration in which Dr. Glancey averred that, to his knowledge, I "ha[d] *construed* the term 'seed delivery system' to mean 'system . . . that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position,'" and separately "*determined* that there is '[n]o disclaimer of a seed delivery apparatus / system / method that allows for seeds to drop by gravity between the seed meter and discharge.'" D.I. 213-1 at 118 (emphasis added; some alterations in the original).

The order itself, *which Deere drafted* for my signature, also makes clear that I had construed the seed delivery system terms to mean—and only mean— "apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position." The order's use of bolded language and quotation marks shows that the "no disclaimer" language is not part of the construction. D.I. 191. The construction of the seed delivery system terms is bolded and surrounded by quotation marks: **"apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position."** D.I. 191 at 3. Bold font and quotation marks were used for every other term that I construed in the order. *See generally* D.I. 191. In

43

contrast, the "no disclaimer" language is neither bolded nor surrounded by quotation marks. *See* D.I. 191 at 3.

Deere argues that I "endorsed" a claim construction of the seed delivery system terms that includes the "'no disclaimer' requirement" when I said at a side bar during Dr. Glancey's direct examination that "it's a fair reading given the way the order is structured to say that the [qu]ote 'no disclaimer' is part of the construction of the term." D.I. 483 at 9–10 (quoting Trial Tr. 391:4–6). But I made that comment outside the jury's presence as I contemporaneously and— because the jury was once again waiting—hurriedly examined the *Markman* order, which I had not seen in more than two years. And I made clear at the time that I was uncomfortable with Deere's reading of the order, that I would entertain further argument on the issue, and that Deere was taking a risk if it continued to assert that my rejection of Precision's disclaimer argument was part of my construction of the seed delivery system terms:

> *I will say this, though, for the record. I think Deere has overreached. I signed that order. When I signed the order, I did it because, frankly, it was presented to me as a stipulated order. I would have said, had I drafted the order, sua sponte. I would have said my construction is the first paragraph. I would have said the rationale for my rejection of Deere's additional limitation was the "no disclaimer" language. And I think Deere is, frankly -- I think they are taking a risk pursuing this as if it is my construction.*

44

> And don't forget *[O]2 Micro*.  I can construe the claim at any point during the proceedings.  And I need to rethink that because *I don't think a Court's statement that there is no disclaimer constitutes claim construction.*
>
> *But the problem is it -- is the slide has been shown to the jury already.  It is a fair reading of the stipulated order.  So I think it would be unfairly prejudicial to Deere right now to say you can't continue with that slide.*
>
> *However, I think they've gone down a road, I think, they have overreached.  I do not think a Court's statement on the record rejecting an argument that there's a disclaimer constitutes claim construction.*
>
> *All right.  So you can play it however you want.*
>
> [DEERE'S COUNSEL]:  Okay.
>
> [PRECISION'S COUNSEL]:  Thank you.
>
> THE COURT: *There is going to be a risk.  I will hear further argument on it.*  I will have to reread *[O]2 Micro*. I think I am permitted to construe the claim at any point in the process.

Trial Tr. 392:11–93:18 (emphasis added).

At a later side bar (again outside the presence of the jury), after having had an opportunity to review the *Markman* order more carefully, I told counsel that "[t]he disclaimer [language in the order] is not in quotes, and I never intended it to be part of the construction" of the seed delivery system terms.  Trial Tr. 1030:24–25.  Deere insists that I "removed the 'no disclaimer' requirement" at this point. D.I. 483 at 6.  But there was never a "'no disclaimer' requirement" to remove.  In

any event, I expressly told Deere it was free to argue to the jury that my claim construction did not preclude a free-fall or gravity drop of the seed.  Trial Tr. 1031:1–9.  And, in fact, Deere made that exact argument to the jury in its closing.

Deere provides no record citations to support its assertion that "at the end of the trial, [I] redefined [my] construction to require 'removing seed from the seed meter by capturing the seed…' using only the loading wheel," D.I. 483 at 6 (ellipses in the original; alterations added); *see also* D.I. 483 at 17 (stating without supporting record citation that "The Trial Construction limited the "remov[al] . . . by captur[e]' operation to only a 'loading wheel'") (alterations and ellipses in the original).  That failure is not surprising because the assertion is simply not true.  I construed the seed delivery system terms to require removal of the seed from the meter by capture; but I never construed the terms to include a requirement that the removal "us[e] only [a] loading wheel."

In any event, had I added a loading wheel requirement, it would have made no difference.  Precision admitted at trial that it is the SpeedTube's loading wheels that remove the seed from the vSet2 meter.  *See* Trial Tr. 871:6–10 ("So the seeds approach on the disk and enter the throat region here, again, and then eventually make contact with the feeder wheels where they're projected and accelerated downward for a distance, eventually received by the belt.") (Radtke's testimony).  The only infringement dispute at trial was whether the loading wheels capture the

seed when they remove it from the seed meter. *See* Trial Tr. 188:1–7; 1224:8–16.

As Deere states in its opening brief:

> There is no factual dispute over how the vSet2 seed meter and Speed Tube "seed delivery system" operate. *SpeedTube includes two "loading wheels" that remove seeds from the vSet2* and insert them into a "flighted belt[.]"

D.I. 483 at 7 (emphasis added and citations omitted).

In sum, my construction of the seed delivery system terms remained consistent throughout trial. Before the jury was called in, I addressed Precision's objections to Deere's inclusion of the disclaimer language in its opening statement demonstratives. I allowed Deere to display a slide that included the disclaimer language, not as a manifestation of my construction, but as an argument that Deere was allowed to make. *See* Trial Tr. 31:2–4. And I emphasized that if an actual claim construction dispute arose during the trial, then I would reconstrue the term, as I could (and was required to) under *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008); *see also* Trial Tr. 32:13–16. I never ended up reconstruing the term because no actual claim construction dispute ever arose. I told Deere that it was "free to *argue*" that the claims did not preclude a free fall or gravity drop of the seed. I precluded Deere only from representing to the jury that the "no disclaimer" language was part of my construction of the seed delivery system terms. I did so because that language was not part of my

47

construction, and because I thought presenting a "no disclaimer" as part of a claim construction would confuse the jury. Trial Tr. 1031:1–2. Deere responded, "Judge, we're fine with that." Trial Tr. 1032:7.

Finally, even if my construction had not remained fixed, Deere has failed to explain how it suffered prejudice that warrants a new trial. Deere says it was "[p]reclud[ed] . . . from arguing the full claim scope and correct construction[.]" D.I. 517 at 7. But, as just explained, it was not. I expressly allowed (pun intended) Deere to argue that the claims did not disclaim or exclude from their scope a method or system that allows for the seed to drop by gravity between the seed meter and the discharge. *See* Trial Tr. 1031:2–4 ("You are free to argue, and I expect you all will, that where in that claim does it say you can't have any kind of free-fall."). When I told Deere that it could no longer characterize my construction as including a "no disclaimer," Deere asked "that there be no argument made about the fact [that Deere's] slides had it in the opening" but not later in the trial, Trial Tr. 1031:13–14. I agreed, and "to accomplish fairness," precluded Precision from making argument about the disputed slide Deere had used in its opening, and I told Deere it could still argue in its closing that there was no gravity-drop disclaimer in the asserted claims. *See* Trial Tr. 1031:19–32:423. Deere responded, "No problem. . . . Judge, we're fine with that." Trial Tr. 1031:24–32:7. And sure enough, Deere's counsel stated in his closing argument that "the Court has made

48

clear that the claim permits -- does not exclude gravity drop.  And you will not

hear the defendants' counsel say that it does not include gravity drop."  Trial Tr.

1204:12–15.

        **b.**        **There Was No "Capture" Claim Construction Dispute**

Deere next argues that a new trial is warranted because I improperly failed to

resolve a fundamental claim construction dispute about the meaning of "capture."

D.I. 483 at 8.  Specifically, Deere suggests that dueling dictionary definitions of

"capture" *that Deere introduced to the jury over Precision's objection* show that an

unresolved claim construction dispute improperly went to the jury.  D.I. 483 at 8–

9.

Under *O2 Micro*, the trial court must resolve any "fundamental dispute

regarding the scope of a claim term."  521 F.3d at 1363; *see also Advanced Fiber*

*Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1373 (Fed. Cir.

2012) (stating that courts "do not ordinarily construe words that are not in claims,"

but "in those cases in which the correct construction of a claim term necessitates a

derivative construction of a non-claim term, a court may perform the derivative

construction in order to elucidate the claim's meaning").  But "litigants waive their

right to present new claim construction disputes if they are raised for the first time

after trial."  *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1358–59

(Fed. Cir. 2006); *see also Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314,

1320 (Fed. Cir. 2003) ("[P]arties cannot reserve issues of claim construction for

the stage of post-trial motions.").

Deere's actions—at all stages of these proceedings—demonstrate that it did

not raise an *O2 Micro* issue regarding the scope of the seed delivery system terms

or of "capture." Deere did not propose during the *Markman* hearing that "capture"

be construed. It did not ask for any further claim construction of the seed delivery

system terms, capture, or any other term after the *Markman* hearing. It *opposed*

Precision's motion for additional claim construction and stated in its opposition

that "[n]o further construction of '[seed] delivery system' is required." D.I. 213 at

10. It did not ask at trial for further construction of the seed delivery system terms

or of "capture" to be included in the jury instructions. And when I discussed the

meaning of "capture" with the attorneys during a sidebar, Deere still did not ask for

a further construction. *See* Trial Tr. 538:15–23.

Deere's failure to properly preserve its claim construction argument

distinguishes this case from *O2 Micro*, where "the parties disagreed *during claim

construction* about" the scope of a term. *See Function Media, L.L.C. v. Google,

Inc.*, 708 F.3d 1310, 1325 (Fed. Cir. 2013) (emphasis added); *see also, e.g., GPNE

Corp. v. Apple, Inc.*, 108 F. Supp. 3d 839, 851 (N.D. Cal. 2015) ("At the outset,

. . . the Court notes that GPNE never requested that the Court provide a more

detailed construction of [the derivative claim construction terms] until well into the

trial. . . . This delay significantly diminishes the persuasive value of GPNE's *O2 Micro* argument."). Deere "cannot now . . . [point] to ambiguous statements in the record" to raise a new claim construction argument, *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010), especially since the statements it points to were adduced by Deere itself.

Deere asserts, for example, that Dr. Glancey's and Dr. Fleming's different "capture" interpretations show that a fundamental claim construction dispute went to the jury. And it highlights different dictionary definitions that the two experts considered in reaching their conclusions. D.I. 483 at 8–9. But *it was Deere* who sought to admit into evidence dictionary definitions of "capture" in the first place. Deere moved during Dr. Glancey's direct examination to admit a definition of "capture" from the *Oxford English Dictionary*. Trial Tr. 395:2–5. Precision objected. Trial Tr. 395:23–96:7. Deere responded, "[w]e're just talking about what is the plain and ordinary meaning of 'capture.'" Trial Tr. 396:14–15. Deere then asked Dr. Glancey questions based on this definition. *See* Trial Tr. 399:6–19. And when Deere cross-examined Fleming, it asked Fleming about one of the dictionaries cited in Fleming's expert report. Trial Tr. 1073:7–75:12. Precision had not sought to admit the dictionary and had never discussed the dictionary during Fleming's direct examination.

In sum, to the extent that there is some conceivable claim construction dispute, it is of Deere's own making.  Deere, however, cannot manufacture a claim construction argument by asking questions about dictionary definitions, enter them into evidence, lose, and then argue that admitting those very definitions was erroneous.

Even if Deere's *O2 Micro* argument had been properly preserved, it still fails on the merits.  As Dr. Glancey's and Dr. Fleming's competing testimony made clear, the parties simply disputed how the construed claims should be applied to the accused devices.  To the extent that the experts discussed the meaning of "capture," they were—by Deere's own admission—"just talking about what is the plain and ordinary meaning of 'capture.'"  Trial Tr. 396:14–15.  That is precisely the type of factual inquiry that is properly left to the jury.  *See Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1360 (Fed. Cir. 2017) (holding that it was proper for the jury to evaluate competing expert testimony about if the accused products met the ordinary meaning of the relevant claim limitation).

The Federal Circuit in *PPG Industries v. Guardian Industries Corp.* rejected the very argument that Deere now advances.  156 F.3d 1351 (Fed. Cir. 1998).  The patent owner in *PPG Industries* alleged infringement of a patent for a certain type of glass.  *Id.* at 1354.  The patent included the claim term "consisting essentially of" certain ingredients and characteristics.  The district court construed this term as

encompassing glass with other unlisted ingredients "so long as those other unlisted ingredients do not have a material effect on the basic and novel characteristics of the glass." *Id.* After trial, the patentee argued that the meaning of "material effect" was a claim construction issue that should not have gone before the jury. *Id.* The Federal Circuit rejected this argument, holding that while claim construction requires the court to determine the scope of the claim, "after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact." *Id.* at 1354–55; *see also GPNE*, 108 F. Supp. 3d at 852–54 (holding, under *PPG*, that defining "pager," a word that was part of the construction of the claim term "node," was properly left to the jury).

Here, like in *PPG*, the experts disagree about whether Precision's accused products infringe Deere's asserted patents, not whether there is a fundamental dispute about the scope of a claim term. Because no issue of claim scope was submitted to the jury, there is no *O2 Micro* problem. *See Function Media*, 708 F.3d at 1327 ("FM has not persuaded us that any issues of claim scope were submitted·to the jury, and we therefore conclude that no *O2 Micro* problems are present in this case.").

c.    **Precision Did Not Improperly Argue Two Different Claim Constructions**

Precision's expert, Dr. Fleming, testified at trial that the accused products did not infringe the asserted claims under the Court's construction of the seed delivery system terms but that if Deere were permitted to stretch the application of its patent claims to cover the SpeedTube and vSet2 meter, then the asserted claims would be invalid under the prior art. Trial Tr. 971:15–24. Deere did not object to this testimony. Nor did Deere object to the invalidity instruction I gave to the jury. That instruction reads in relevant part:

> [Precision] contends that the Asserted Claims are invalid as obvious under Deere's infringement allegations—in other words, if Deere is correct that the Asserted Claims cover Precision's products, [Precision] contends that the claims also cover the prior art and are invalid.

D.I. 488-2 at A3133–34.

Consistent with that instruction, Precision's counsel stated in his closing argument:

> Now, as we just saw, the evidence showing noninfringement is clear and extensive, but there is another reason to know that Precision doesn't infringe. And that's because if you apply the claims the way Deere is trying to apply the claims, to stretch the claims, to stretch the Court's claim construction to cover Precision's products, then the claims would cover what existed many decades ago.

\* \* \* \*

54

> . . . [F]or its infringement claims against SpeedTube,
> Deere wants you to believe that the removal by capture
> method is met when a wheel projects a seed down to a
> flighted belt.  They want you to believe that it's met
> when a wheel simply knocks the seed off the seed meter
> by making any contact with the seed regardless of how
> brief that contact is.
>
> So just like [a] pitching machine.  Barely any
> contact, the ball is projected and accelerated, and they
> say that constitutes removal by capture.
>
> Now, if they were right about that -- and to be
> really clear, we don't think that they're right about it --
> then their claims would cover what was known in the art
> long ago.

Trial Tr. 1233:11–34:12.  Deere did not object to this argument.  Moreover, it was

*Deere* who requested that the jury verdict form instruct the jury to make findings

on invalidity for each asserted claim "only if" the jury found that Precision had

infringed that claim.  D.I. 532-4 at 7, 9.

Deere now argues that it is entitled to a new trial because Precision

"impermissibly argued at trial two claim constructions—one for infringement and

one for invalidity."  D.I. 483 at 21.  But it has waived that argument by virtue of its

failure to object to Dr. Fleming's testimony, the invalidity jury instruction,

Precision's closing argument, and the jury verdict form.  *See* Fed. R. Evid. 103(a)

("A party may claim error in a ruling to admit or exclude evidence only if that

error affects substantial right and: (1) if the ruling admits evidence, a party, on the

record: (A) timely objects or moves to strike; and (B) states the specific ground,

55

unless it was apparent from the context."); Fed. R. Civ. P. 51(c)(1) ("A party who objects to [a jury] instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection."); *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 400 (3d Cir. 2016) ("Where, however, a party failed to object to the admission of evidence before the District Court, we deem that objection waived on appeal."); *Franklin Prescriptions, Inc. v. New York Times Co.*, 424 F.3d 336, 339 (3d Cir. 2005) ("Many cases hold that a proper request for a jury instruction is not alone enough to preserve the right to appeal failure to give the instruction.") (quoting Fed. R. Civ. P. 51 advisory committee notes to 2003 amendment); *Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 200 (3d Cir. 1995) (en banc) ("Finally, where a defendant fails to object to the form and language of special verdict forms or to the jury charges, before closing arguments or at the close of charging before the jury retires to deliberations, and the form had been submitted to counsel, objections are waived."); *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) ("As the district court correctly noted, it is clear that a party who fails to object to errors at trial waives the right to complain about them following trial.") (citing *Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (3d Cir.1979) ("Counsel's failure to object precludes him from seeking a new trial on the grounds of the impropriety of opposing counsel's closing remarks.")).

In any event, Precision's conditional validity argument was not erroneous. As the Federal Circuit held in *01 Comunique Laboratory, Inc. v. Citrix Systems, Inc.*, 889 F.3d 735, 742 (2018), nothing in its case law "preclude[s] a litigant from arguing that if a claim term must be broadly interpreted to read on an accused device, then this same broad construction will read on the prior art." That is exactly what Precision argued here.

### d.    Alleged Jury Instruction and Evidentiary Errors

Deere next argues that a new trial is warranted because I erroneously allowed Precision to introduce evidence of its own patents to prove noninfringement and I failed to instruct the jury that the existence of a defendant's patent is not a defense to infringement. D.I. 483 at 27–28. Precision, however, did not rely on its own patents to dispute infringement, but rather to support Precision's invalidity contentions and to rebut Deere's copying allegations. *See, e.g.*, Trial Tr. 856:6–12 ("Q: Why did you decide to use a flighted belt for SpeedTube?  A: Well, for one, we already had a patent on it.  And additionally, with the flighted belt, given that it only requires a single belt, say, compared to the pinch belt solution, we believed that would be more compact, more efficient, possibly less power consumption.").

Deere also argues I erred in allowing Precision to adduce evidence that it is an "innovative" company.  But the admission of that evidence was appropriate to

respond to Deere's assertions in front of the jury that it had a long history of innovation and to rebut Deere's allegations that Precision had willfully infringed the asserted patents.  In a similar vein, Deere argues that I erred by not instructing the jury on the irrelevance of comparisons between Precision's accused products and commercial embodiments of Deere's patents.  But Precision did not rely on such comparisons to prove noninfringement.

Deere also contends that I erroneously precluded it from cross-examining Mr. Ian Radtke—who worked on the SpeedTube—about U.S. Patent No. 8,985,037 (the #037 patent), a patent that Precision owned.  Precision had asked Radtke about patents that Precision owned that related to the SpeedTube.  *See, e.g.,* Trial Tr. 853:20–54:6.  When Precision asked these questions, Deere did not object.  Instead, when cross-examining Radtke, Deere sought to admit evidence relating to the #037 patent.  *See* Trial Tr. 897:7–8, 19–20.  Before the testimony was offered or mentioned to the jury, Precision objected.  Precision argued during a sidebar that #037 patent's design was distinct from the SpeedTube's design, so comparing the designs would be improper.  Precision never grounded its objection under a Federal Rule of Evidence.  *See* Trial Tr. 897:19–98:2.

Deere offered two responses to Precision's objection.  First, Deere attempted to show me a figure in the #037 patent that it argued "looks a lot like SpeedTube." Trial Tr. 901:11–13.  I responded:

58

> Just so the record is clear, [Deere] is showing a figure
> from the patent at issue.  I will not base a ruling in
> [Deere's] favor on that figure, [because] then we are off
> to a mini trial about the contents of the patent and
> whether this figure, in fact, is the commercial
> embodiment or the accused products.

Trial Tr. 901:16–21.  Second, Deere argued that the comparison was proper

because Precision "gave [Deere] an interrogatory response that says this patent

covers the design for the feeder wheels" in the SpeedTube.  Trial Tr. 898:20–22.  I

also rejected this argument:

> I'm not going to allow you to pursue this line of
> questioning.  The sentence in question cited by Deere
> says, quote, "Precision Planting obtained patents showing
> the novel idea for the feeder wheels," unquote.
>
> That's not the same thing as the feeder wheels that
> are actually used in the accused products, and I'm not
> going to allow under [Federal] Rule [of Evidence] 403,
> us to get into a mini trial [about whether] [t]his patent not
> asserted in this case covers the accused products and uses
> language that it would be fair to conclude addresses the
> exact same issues in and language used in the asserted
> patents.

Trial Tr. 902:2–13.

Now, Deere argues that had it been allowed to question Radtke about a

sworn statement that he made to the Patent and Trademark Office that related to

the #037 patent, Deere could have powerfully impeached Radtke's direct

examination testimony that the SpeedTube's feeder wheels do not remove the

seeds from the meter by capturing them.  D.I. 483 at 32.  But the citations in

Deere's brief show that Precision referred to its prior patents only minimally.  And as noted above, the references were properly offered to explain Precision's development process and rebut Deere's copying allegations.  *See, e.g.*, Trial Tr. 45:23–46:2 (Precision explaining that it was offering prior patent evidence "to show evidence of our development process, and particularly where they're accusing us of having copied their technology"); *see also* Trial Tr. 856:6–14. Accordingly, I properly sustained Precision's objections to Deere's questioning of Mr. Radtke under Rule 403.  *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

Even if Deere's evidentiary objections had merit, Deere has not shown that it suffered undue prejudice that would justify upsetting the jury's verdict by granting a new trial.  *See Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 85 F. Supp. 3d 768, 775–76 (D. Del. 2015) ("[W]here the ground for a new trial is that the jury's verdict was against the great weight of the evidence, the Court should proceed cautiously, because such a ruling would necessarily substitute the Court's judgment for that of the jury.").  Moreover, the jury instructions protected Deere from any potential prejudice.  *See, e.g.*, D.I. 488-2 at A3129 (instructing the jury that "[t]o prove that Precision directly infringed any Asserted Claim by literal

60

infringement, Deere must prove by a preponderance of the evidence, i.e., that it is more likely than not, that (1) each and every element of the Asserted Claim is literally present in the Precision products at issue, and (2) Precision Planting or AGCO made, used, sold, or offered to sell the accused SpeedTube and vSet2 products at issue in the United States.  A claim element is literally present if it exists in the products at issue or was performed by the accused method as it is described in the claim language.  If an accused product does not possess any one element recited in a claim, then you must find that that particular product does not literally infringe that claim.").

In short, Deere has not demonstrated an erroneous evidentiary ruling or jury instruction that resulted in a miscarriage of justice or shocked the conscience such that a new trial on infringement is warranted.

C.    **Invalidity**

Deere argues that I should grant JMOL or a new trial with respect to invalidity or alternatively dismiss Precision's invalidity counterclaims with prejudice.  D.I. 483 at 21–26.  With respect to its JMOL request, because a reasonable juror would follow the verdict form instructions that Deere proposed and I adopted, a reasonable juror would not address the validity of the asserted claims unless it first found that the SpeedTube and vSet2 meter infringed those claims.  Accordingly, since Deere did not prevail at trial on its infringement

claims, Deere can only be entitled to a JMOL of no invalidity if it is entitled to a JMOL of infringement. I have already determined, however, that Deere is not entitled to a JMOL of infringement. Therefore, Deere cannot prevail on its request for a judgment of no invalidity as a matter of law.

Deere argues that it is entitled to a new trial on invalidity because I allowed Precision to assert a conditional validity defense and argue two different claim constructions to the jury. I have already rejected these arguments, and therefore I will deny Deere's request for a new trial on invalidity.

Finally, Deere argues that absent my granting a JMOL of no invalidity, I should dismiss with prejudice Precision's invalidity counterclaims. D.I. 483 at 26; D.I. 517 at 11. Deere cites no case law in support of its request. For its part, Precision does "not oppose dismissing its invalidity counterclaims for the asserted claims, provided that any dismissal is conditional on the noninfringement judgment remaining undisturbed." D.I. 513 at 22. I therefore will dismiss Precision's counterclaims without prejudice. *See SSI Techs., LLC v. Dongguan Zhengyang Elect. Mechanical Ltd.*, 59 F.4th 1328, 1338 (Fed. Cir. 2023) ("[W]e have repeatedly held that a district court faced with an invalidity counterclaim challenging a patent that it concludes was not infringed may either hear the claim or dismiss it without prejudice.") (internal quotation marks and citations omitted) (citing *Flexuspine, Inc. v. Globus Med., Inc.*, 879 F.3d 1369, 1376 (Fed. Cir. 2018)

(concluding "that the district court was within its discretion to dismiss [the defendant's] invalidity counterclaims without prejudice" after the jury delivered a verdict of noninfringement); *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1371 (Fed. Cir. 2004) ("A district court judge faced with an invalidity counterclaim challenging a patent that it concludes was not infringed may either hear the claim or dismiss it without prejudice, subject to review only for abuse of discretion.")).

## D.     Deere's Remaining Arguments are Moot

Deere raises a host of objections relating to contributory infringement, willfulness, and damages. *See* D.I. 483 at 33–37. Because I will deny Deere's motion for JMOL of direct infringement and its request for a new trial on direct infringement, I need not address these arguments. "[T]here can be no inducement or contributory infringement without an underlying act of direct infringement." *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012) (citation omitted). And with no verdict of infringement, Deere is entitled to no damages. *See* 35 U.S.C. § 284 ("Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement[.]").

63

## IV.    CONCLUSION

For the reasons discussed above, I find that Deere has forfeited its right to

seek relief under Rules 52, 54, and 60 and its right to seek a Rule 50(b) JMOL of

infringement.  Deere also waived many of the claim construction arguments that it

now says justify a new trial.  But even if Deere had not waived these arguments, I

would deny on the merits Deere's request for JMOL of infringement and its

alternative request for a new trial on infringement.  My claim construction of the

seed delivery system terms never changed.  And no fundamental claim

construction dispute ever went to the jury.  Precision also did not improperly

present different claim constructions for infringement and invalidity.  And no jury

instruction or evidentiary errors justify granting a new trial.  Therefore, any

remaining disputes about willful or contributory infringement and damages are

moot.

Because Deere is not entitled to JMOL of infringement, it is not entitled to

JMOL of no invalidity.  Nor has Deere demonstrated a miscarriage of justice or

other circumstance that would warrant a new trial on invalidity.

Deere has failed to provide legal support to justify its request for dismissal

of Precision's invalidity counterclaims with prejudice.  I will, however, dismiss

those counterclaims without prejudice to refile if the judgment of noninfringement

in this case is reversed, vacated, or otherwise modified on appeal.

64

I will therefore deny Deere's motion in its entirety.

The Court will issue an Order consistent with this Opinion.